# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

CYNTHIA T.,[1]

Plaintiff,

  vs.

ANDREW SAUL,
Commissioner of Social Security,

Defendant.

Case No. 3:19-cv-00130-SLG

## DECISION AND ORDER

On or about August 3, 2016, Cynthia T. filed an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"), alleging disability beginning January 1, 2012.[2] Ms. T. has exhausted her administrative remedies and filed a Complaint seeking relief from this Court.[3] Ms. T.'s opening brief asks the Court to reverse and remand the agency decision.[4] The Commissioner filed an Answer and a

---

[1] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), *available* https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Administrative Record ("A.R.") 13, 142. The application lists August 15, 2016. A.R. 142. Pursuant to 20 C.F.R. § 416.335, the ALJ used the August 3, 2016 application date as the date Ms. T. became potentially eligible for SSI benefits. A.R. 13. At her April 20, 2018 hearing, Ms. T.'s attorney also acknowledged the August 3, 2016 application date as the "operative date." A.R. 30.

[3] Docket 1 (Cynthia T.'s Compl.).

[4] Docket 14 (Cynthia T.'s Br.). The Court granted Ms. T.'s Motion for Extension of Time to File Social Security Brief on August 19, 2019. Docket 13.

brief in opposition to Ms. T.'s opening brief.[5]  Ms. T. filed a reply brief on September 23, 2019.[6]  Oral argument was not requested and was not necessary to the Court's decision. This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[7]  For the reasons set forth below, Ms. T.'s request for relief will be denied.

## I.      STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[8] "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[9]  Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[10]  In reviewing the agency's determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[11]  If the evidence is susceptible to

---

[5] Docket 10 (Answer); Docket 15 (Defendant's Br.).

[6] Docket 16 (Reply).

[7] 42 U.S.C. § 405(g).

[8] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[9] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[10] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

[11] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

more than one rational interpretation, the ALJ's conclusion must be upheld.[12]  A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which [he] did not rely."[13]  An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination . . . or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[14]  Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[15]  In particular, the Ninth Circuit has found that the ALJ's duty to develop the record increases when the claimant is unrepresented or is mentally ill and thus unable to protect her own interests.[16]

## II.    DETERMINING DISABILITY

The Act provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental

---

[12] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[13] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[14] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[15] *Smolen v. Chater,* 80 F.3d 1273,1288 (9th Cir. 1996) (*superseded in part by statute on other grounds,* § 404.1529) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

[16] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

disability.[17]  In addition, SSI may be available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[18]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[19]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[20]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[21]  A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[22]  If a claimant establishes a

---

[17] 42 U.S.C. § 423(a).

[18] 42 U.S.C. § 1381a.

[19] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[20] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[21] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[22] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098

prima facie case, the burden of proof then shifts to the agency at step five.[23] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[24] The steps, and the ALJ's findings in this case, are as follows:

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity." *The ALJ concluded that Ms. T. had not engaged in substantial gainful activity since her application date of August 3, 2016.*[25]

**Step 2.** Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the twelve-month duration requirement. *The ALJ determined that Ms. T. had the following severe impairments: iron deficiency anemia; degenerative disc disease of the cervical spine status post three surgical procedures; degenerative disc disease of the lumbar spine; and pelvic inflammatory disease. The ALJ determined that Ms. T.'s occipital neuralgia; cocaine abuse; alcohol use; bi-polar disorder; generalized anxiety disorder; and possible depression were non-severe impairments.*[26]

_____

(9th Cir. 1999).

[23] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[24] *Tackett*, 180 F.3d at 1101.

[25] A.R. 15.

[26] A.R. 15–16.

**Step 3.**  Determine whether the impairment or combination of impairments meets or equals the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity.  If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled.  If not, the evaluation goes on to the fourth step.  *The ALJ determined that Ms. T. did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.*[27]

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed.  Once determined, the RFC is used at both step four and step five.  An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from her impairments, including impairments that are not severe.[28] *The ALJ concluded that Ms. T. had the RFC to perform light work except that she was additionally limited to:  occasional stooping, kneeling, crouching, crawling, and climbing of ramps or stairs; no climbing of ladders, ropes, or scaffolds; frequent balancing; frequent bilateral overhead reaching, handling, fingering, and feeling; avoiding all exposure to unprotected heights; and occasional exposure to moving and hazardous machinery.*[29]

**Step 4.**  Determine whether the claimant is capable of performing past relevant work.  At this point, the analysis considers whether past relevant work requires the

---

[27] A.R. 16.

[28] 20 C.F.R. § 404.1520(a)(4).

[29] A.R. 17.

performance of work-related activities that are precluded by the claimant's RFC.  If the claimant can still do her past relevant work, the claimant is deemed not to be disabled.  Otherwise, the evaluation process moves to the fifth and final step.  *The ALJ found that Ms. T. was capable of performing past relevant work as a personal care attendant.*[30]

**Step 5.**  Determine whether the claimant is able to perform other work in the national economy in view of her age, education, and work experience, and in light of the RFC.  If so, the claimant is not disabled.  If not, the claimant is considered disabled.  *Although the ALJ determined that Ms. T. was capable of past relevant work, he also determined that in the alternative, there were other jobs existing in the national economy that Ms. T. was able to perform, including cleaner/maid and office helper.*[31]

The ALJ concluded that Ms. T. has not been disabled since August 3, 2016, the date of application.[32]

### III.    PROCEDURAL AND FACTUAL BACKGROUND

Ms. T. was born in 1976; she is 43 years old.[33]  She reported last working in 2011 as a waitress.[34]  Ms. T. reported working as a bingo caller and as a personal care assistant

---

[30] A.R. 20.

[31] A.R. 21.

[32] *Id*.

[33] A.R. 142.

[34] A.R. 51, 163.  At the April 20, 2018 hearing before ALJ Hebda, Ms. T. reported last working at Golden Corral restaurant "probably about ten years ago."  A.R. 51.

in the past.[35]   On February 22, 2017, the Social Security Administration ("SSA") determined that Ms. T. was not disabled under the applicable rules.[36]   On March 24, 2017, Ms. T. requested a hearing before an ALJ.[37]   On April 20, 2018, Ms. T. appeared and testified with representation at a hearing held before ALJ Paul Hebda.[38]   On June 11, 2018, the ALJ issued an unfavorable ruling.[39]   On April 5, 2019, the Appeals Council denied Ms. T.'s request for review.[40]   Ms. T. appealed to this Court on May 6, 2019.[41]

*Medical Records*

Although Ms. T.'s medical records date back to 2012, the Court focuses on the relevant medical records[42] after the application date of August 3, 2016.[43]   However, the following are relevant records before the application date:

---

[35] A.R. 52, 163.

[36] A.R. 61–74.

[37] A.R. 79.

[38] A.R. 49–53.

[39] A.R. 10–22.

[40] A.R. 1–5.

[41] Docket 1.

[42] There are multiple duplicate treatment notes in the Court's record.  To the extent possible, the Court cites the first treatment note to appear in the medical record.

[43] The ALJ must consider a claimant's "complete medical history for at least the 12 months preceding the month in which [a claimant files her] application" unless there is a reason to develop the medical history of an earlier period or the claimant states that her disability began less than 12 months before filing the application.  20 C.F.R. § 416.912(d) (effective April 20, 2015 to March 26, 2017).  *See also* A.R. 13.

On October 26, 2012, Ms. T. saw Roland Torres, M.D., at Alaska Native Medical Center Hospital ("ANMC"). She reported severe neck pain with "numbness and tingling in her left arm and shoulder." She reported that the neck pain was episodic, worsening, and had lasted nearly a year. Ms. T. also reported being involved in a motor vehicle accident in October 2011 and another accident four months prior to her appointment with Dr. Torres. On physical examination, Dr. Torres observed "[m]oderate posterior cervical spine muscle spasm"; mild numbness and weakness in the left upper extremity (4/5); and that Ms. T. was alert and oriented; cooperative with an appropriate mood and affect; and exhibited normal judgment. Dr. Torres diagnosed Ms. T. with cervical herniated disc; cervical paraspinal muscle spasm; stenosis of the cervical spine region; and cervical radicular pain.[44] On the same date, Ms. T. underwent C4 to C7 anterior cervical discectomy and fusion at ANMC.[45]

On January 22, 2014, Ms. T. saw Ingrid Carlson, PA, at ANMC. She reported increased neck pain. She also reported that after the cervical fusion surgery in 2012 she was supposed to go to physical therapy, but she did not do so. On physical examination, PA Carlson observed that Ms. T.'s neck was supple; non-tender; and with no carotid bruit, no lymphadenopathy, and no thyromegaly. PA Carlson noted that Ms. T. was alert and oriented; in no acute distress; and was cooperative. PA Carlson referred Ms. T. to physical

---

[44] A.R. 2296–2300.

[45] A.R. 2290–92.

therapy.[46]  At the appointment, Ms. T. tested positive for cocaine metabolite.[47]  X-rays of the cervical spine taken on the same date showed "some loosening of the orthopedic fixation of the screw plate of the mid to lower cervical spine" and "one or possibly two of the screws appear to be backing out."[48]

On February 12, 2014, Ms. T. saw William Betts, M.D., at ANMC.  She reported an "exacerbation of neck pain."  She also reported stable subjective weakness of both hands.  On physical examination, Dr. Betts observed full range of motion in the neck; normal motor, sensory, and speech; intact grip strength; 2+ brachioradialis reflexes bilaterally; intact sensation; and that Ms. T. was alert and oriented.  Dr. Betts noted that Ms. T. required surgery "to remove her current instrumentation and refuse the neck at C4-5, C5-6, and C6-7."[49]  On the same date, the x-ray of the cervical spine showed "stable partial backing out of a screw at C4 and C7."[50]

On February 19, 2014, Ms. T. followed up with Laurel Christians, ANP, at ANMC.  On physical examination, ANP Christians observed that Ms. T. was "[a] bit labile today" and had a normal gait and range of motion.  ANP Christians noted that Ms. T. had elevated blood pressure, but "she left before [ANP Christians] could" address it.[51]  On the same

---

[46] A.R. 1677–79.

[47] A.R. 1696.

[48] A.R. 1672.

[49] A.R. 1115–17.

[50] A.R. 1125.

[51] A.R. 1644–47.

date, Ms. T. tested positive for oxycodone, oxymorphone, noroxycodone, nordiazepam, temazepam, oxazepam, cocaine metabolites, ethanol quantitation, ethyl glucuronide, and ethyl sulfate.[52]

On March 27, 2014, Ms. T. underwent a two-stage surgical procedure "involving (1) removal of the anterior cervical hardware from C4 to C7, anterior cervical fusion at C4-5, anterior cervical cage placed, and removal of old anterior cervical cage followed by (2) posterior cervical fusion from C4 to T2 with instrumentation, and C4, C5, and C6 bilateral laminotomy, foraminotomy, and facetectomy without complications." She was discharged from the hospital on March 29, 2014.[53]

On May 15, 2014, Ms. T. had x-rays of her cervical spine. The x-rays showed "posterior cervical spine fusion extending from C4 through T2" and a "grossly normal alignment."[54]

On September 10, 2014, Ms. T. saw James Parietti, PT, at ANMC. She participated in physical therapy for her neck. Ms. T. reported she had no neck pain.[55]

On January 20, 2015, Ms. T. had a CT scan of her cervical spine. The CT showed "postsurgical changes" at C4-T2 "without hardware complication or evidence of

_____

[52] A.R. 1657–59. Ms. T. also tested positive for cocaine metabolites, ETOH, and other drugs not prescribed on April 10, 2014 and January 23, 2015. A.R. 1392, 1524. She tested positive for cannabinoids and negative for cocaine metabolites and UR alcohol on August 11, 2014. A.R. 1460. She tested positive for cannabinoids and cocaine metabolites on August 25, 2015. A.R. 366.

[53] A.R. 2316–25.

[54] A.R. 1477.

[55] A.R. 1433.

loosening" and "mild to moderate left osseous foraminal narrowing at the left C4-5 level and mild at the left C6-7 level."[56]

On August 25, 2015, Ms. T. saw Benjamin Garnett, M.D., at the emergency department at ANMC. She reported an acute onset of "sharp lower abdominal pelvic pain" with fevers, sweats, and chills. Dr. Garnett diagnosed Ms. T. with acute pelvic inflammatory disease. He noted also that "no etiology for the patient's recent drop in hemoglobin [was] identified" by a CT scan of the abdomen and pelvis.[57] Ms. T. had an ultrasound of her pelvis on the same date. The ultrasound report noted that "findings could represent a hemorrhagic left ovarian cyst and complex fluid in the pelvis" and "early inflammation cannot be excluded." Ms. T. was hospitalized at ANMC for three days.[58]

On August 25, 26, 27, and 28, 2015, Ms. T. had psychosocial assessments while hospitalized at ANMC. The assessments consistently showed appropriate, calm, cooperative behavior; pleasant affect; orientation x4; and independence completing activities of daily living.[59]

On September 16, 2015, Ms. T. saw Stephanie Eklund, M.D., at ANMC. She reported decreased pelvic pain. The ultrasound of her pelvis showed "apparent resolution of the posterior pelvic complex fluid collection seen previously." Dr. Eklund noted that

---

[56] A.R. 1399.

[57] A.R. 340–54.

[58] A.R. 358–59.

[59] A.R. 1846–52.

"[b]oth the resolution of pain and her [ultrasound] supports improvement" of pelvic inflammatory disease.[60]

On March 31, 2016, Ms. T. saw Mary Cavalier at Behavioral Services Division at ANMC. She reported "bad mood swings [and] anxiety." Ms. Cavalier noted that Ms. T.'s primary care provider diagnosed Ms. T. on November 27, 2015 with "mild to no depressive symptoms." Ms. Cavalier referred Ms. T. to a primary care provider to "rule out physical causes for symptoms."[61]

On June 13, 2016, Ms. T. saw Troy Wolcoff at the Behavioral Health Clinic at ANMC. She reported, "I think I have anxiety, my moods are out of control. I am pushing people away." On examination, Mr. Wolcoff observed that Ms. T. was cooperative with an appropriate mood and affect; normal judgment; congruent behavior; appropriate thought processes; and no abnormal or psychotic thoughts. He diagnosed Ms. T. with generalized anxiety disorder and mood changes and a differential diagnosis of "rule out bipolar disorder, rule out panic disorder."[62]

On June 24, 2016, Ms. T. saw Katharine Andre, M.D., at ANMC. She reported diarrhea and vomiting and anxiety. She reported her last cocaine use was "maybe a year ago" and reported last drinking alcohol two days before the appointment. On physical examination, Dr. Andre observed that Ms. T. was alert and oriented. Dr. Andre diagnosed

---

[60] A.R. 313–19.

[61] A.R. 293.

[62] A.R. 278–81.

Ms. T. with anxiety and "anemia last year, resolved now." The toxicology screening collected at the visit was positive for cocaine metabolites, alcohol, and marijuana.[63] On the same date, Ms. T. saw Kylie Hendren at the Behavioral Health Center at ANMC. She reported agitation and anxiety. Ms. T. reported looking for work "that does not involve having to work with a lot of people." On examination, Ms. Hendren observed that Ms. T. was cooperative; agitated; anxious; impulsive; and had appropriate thought processes.[64]

On July 18, 2016, Ms. T. had a psychiatric assessment with Cindy Campbell, ANP, at SouthCentral Foundation Behavioral Services Division. On examination, Ms. T. was alert and oriented with fair insight and judgment. Her memory and concentration were intact and her appearance was neat, clean, and casually attired. Her mood was labile and her thought processes were "overall logical and goal directed towards achieving help." There was no evidence of psychosis and she denied suicidal and homicidal ideation. Ms. T. was diagnosed with "other specified bipolar and related disorder," alcohol use disorder, and cocaine use disorder. She was prescribed Abilify.[65]

The following are the more relevant records after the application date of August 3, 2016:

---

[63] A.R. 261–74.

[64] A.R. 275–77. Ms. T. followed up at the Behavioral Health Center at ANMC on June 29, 2016 and July 8, 2016. A.R. 255–60. On examination at both appointments, Ms. T. was cooperative with an anxious mood and affect, agitated behavior, impulsive judgment, and appropriate thought process. A.R. 257.

[65] A.R. 388–91.

On August 15, 2016, Ms. T. saw Katie Ellsworth, RN, at the emergency department at ANMC. She reported neck pain that began the previous week after she lifted a grocery bag at home. On physical examination, RN Ellsworth observed a stiff, minimally painful gait; limited range of motion in the neck due to pain; normal sensory, motor, speech, and coordination; a cooperative, appropriate mood and affect; and normal judgment.[66] Ms. T. had x-rays of the cervical spine. The x-rays showed "extensive surgical changes of the neck" and "no interval change," as the x-rays appeared similar to those after the 2014 surgery.[67]

On August 16, 2016, Ms. T. saw ANP Campbell at SouthCentral Foundation, Behavioral Services Division. She reported that she felt "happy and calm and not always 'mean and upset.'" On examination, ANP Campbell observed that Ms. T. was alert and oriented with fair insight and judgment and intact memory and concentration. She observed that Ms. T. was neat, clean, causally attired, and arrived on time. ANP Campbell noted that Ms. T was "tolerating Abilify with good results."[68]

On September 1, 2016, Ms. T. had x-rays of her cervical spine. The x-rays showed "stable post surgical changes consistent with fusion of the cervical spine." Ms. T. also had a CT of the cervical spine. The CT showed "some degenerative changes," but "no acute abnormality" and "no change from the prior study."[69]

---

[66] A.R. 241–44.

[67] A.R. 243, 1299.

[68] A.R. 392–93.

[69] A.R. 234, 236.

On September 12, 2016, Ms. T. saw Norman Rokosz, M.D., at ANMC. She reported chronic neck pain. Dr. Rokosz noted that Ms. T. did not "report any arm pain or numbness when questioned." On physical examination, Dr. Rokosz observed that Ms. T. was pleasant, well-nourished, and in no acute distress. He observed that Ms. T. had "a reasonable range of motion" in the neck "except for extension, which [was] limited to 5 degrees, and right lateral rotation, which [was] 50 degrees." He noted that the motor and sensory exams were intact. Dr. Rokosz also noted that it was "quite unlikely that any further surgical intervention would be of benefit," but he believed that "an MRI [was] warranted for a thorough evaluation."[70]

On September 16, 2016, Ms. T. saw Starchild Weivoda, D.O., at ANMC, "to have forms filled out for disability." On that day, Ms. T. reported symptoms of cervical radiculopathy "with radiation to her shoulders and upper extremities" which "interferes with her ability to use her upper extremities without pain for extended periods." On physical examination, Dr. Weivoda observed that Ms.T. was alert and oriented with normal sensory, normal motor function, and no focal deficits. Dr. Weivoda diagnosed Ms. T. with bipolar disorder, chronic neck pain, and radiculopathy of the cervical spine. Dr. Weivoda opined that Ms. T. "may be able to participate in work which does not involve significant physical activity" and that is "limited in duration such that it does not cause her pain."[71]

---

[70] A.R. 232–33.

[71] A.R. 230–31.

On September 22, 2016, Ms. T. had an MRI of the cervical spine. The MRI showed "stable fusion of C4-T2" and the "neural foramina and central canal appear patent at each level."[72]

On September 27, 2016, Ms. T. saw ANP Campbell at SouthCentral Foundation, Behavioral Services Division. She reported, "I thought the medicine was working but then I got anxiety again after 2 weeks." She also reported taking medications as prescribed without any side effects. On examination, ANP Campbell observed that Ms. T. was alert and oriented with fair insight and judgment; happy mood; logical and goal directed thought processes; appropriate associations; and no evidence of psychosis.[73]

On November 28, 2016, non-examining physician Jay Caldwell, M.D., provided an RFC based on his review of the medical record on file. He opined that Ms. T. had the following limitations: occasionally lifting and carrying 20 pounds; frequently lifting and carrying 10 pounds; standing and/or walking about six hours in an eight-hour workday; sitting about six hours in an eight-hour workday; occasionally climbing stairs, ramps, ladders, and scaffolds; frequently crouching and crawling; occasionally reaching overhead; frequently handling; avoiding concentrated exposure to hazards; avoiding moderate exposure to extreme cold, vibration, and fumes, odors, dust, gases, and poor ventilation. Dr. Caldwell also opined that there was "a psychiatric overlay in play."[74]

---

[72] A.R. 228–29.

[73] A.R. 394–95. On October 25, 2016, Ms. T. spoke by telephone with ANP Campbell. She reported "restlessness, inability to sit still, feeling anxious." A.R. 397.

[74] A.R. 377–84.

On December 23, 2016, Ms. T. saw Phillip Weidner, D.O., at ANMC. She was diagnosed with occipital neuralgia. Dr. Weidner performed a bilateral occipital nerve block.[75]

On January 31, 2017, Ms. T. saw ANP Campbell at SouthCentral Foundation, Behavioral Services Division. She reported, "I think the medicine is working but then my brain tells me it is not." She reported taking medications as prescribed without any side effects. ANP Campbell noted that Ms. T. had not been seen in four months and had missed several appointments. On examination, ANP Campbell observed that Ms. T. was alert and oriented with fair insight and judgment; intact memory and concentration; a clean, neat, casually attired appearance; anxious mood; logical and goal directed thought processes; appropriate associations; and no evidence of psychosis. ANP Campbell diagnosed Ms. T. with "[o]ther specified bipolar and related disorder"; moderate alcohol use disorder; and mild cocaine use disorder.[76]

On February 21, 2017, reviewing physician Ron Feigin, M.D., opined that Ms. T.'s understanding and memory were "[n]ot significantly limited." He opined that Ms. T.'s sustained concentration and persistence were moderately limited in some areas such as carrying out detailed instructions, working in coordination with or in proximity to others without being distracted by them, and maintaining regular attendance. Dr. Feigin also opined that Ms. T.'s social interactions and ability to adapt were moderately limited. He

---

[75] A.R. 463–64.

[76] A.R. 399–400.

noted that Ms. T. "does have some mood and anxiety issues; however, she is still capable of performing simple, repetitive work tasks in an environment where she has little to no contact with co-workers and the general public.  She has shown significant improvement, especially when she avails herself of the treatment that has thus far, in her own words, been beneficial."[77]

On March 6, 2017, Ms. T. followed up with ANP Campbell.  She reported, "You know when you asked me before if I was hearing voices?  Well I kind of do."  On physical examination, ANP Campbell observed that Ms. T. was alert and oriented with fair insight and judgment; intact memory and concentration; a clean, neat, casually attired appearance; anxious mood; logical and goal directed thought processes; appropriate associations; and no evidence of psychosis.  ANP Campbell encouraged Ms. T. to resume weekly counseling sessions, but Ms. T. declined.[78]

On April 24, 2017, Ms. T. saw Thai Verzone, PA, at the emergency department at ANMC.  She reported lumbar back pain after she slipped and fell on the ice.  On physical examination, PA Verzone observed that Ms. T. had diffuse, moderate tenderness in the lumbar back and a negative straight leg raise.   PA Verzone observed that Ms. T. was alert, oriented, cooperative, with normal judgment, and an appropriate mood and affect.  The x-rays of Ms. T.'s lumbar spine showed "mild/moderate lumbar spondylosis of the L2-

---

[77] A.R. 68–71.

[78] A.R. 2342–43.  On March 16, 2017, March 21, 2017, and April 24, 2017, a staff member at SouthCentral Foundation Behavioral Services Division attempted to schedule future appointments for Ms. T. with ANP Campbell.  A.R. 2345–47.  On April 28, 2017, Ms. T. requested to pick up records of her sessions with ANP Campbell.  A.R. 2348.

3 and L3-4 levels," but otherwise alignment was anatomic with no fracture or subluxation.[79]  Also on April 24, 2017, Ms. T. saw Dr. Weidner at ANMC.  She reported that the nerve block in December 2016 "was not particularly effective with her neck pain, and she [has] not had any injuries since that time."  She also reported that she had not had "any new treatment for her neck pain since the last time [Dr. Weidner] saw her, or any medication changes."  On physical examination, Dr. Weidner observed that Ms. T. was alert and oriented with no tenderness in the cervical spine; had a normal gait; normal thoracic spine range of motion; decreased cervical spine range of motion; and strength 5/5 bilaterally in the upper extremities.  Dr. Weidner noted, "I do not think this represents occipital neuralgia" and "I think this represents something more consistent with failed neck (back) syndrome."  Dr. Weidner suggested using gabapentin and/or amitriptyline and a TENS unit.[80]

On May 5, 2017, Ms. T. saw Starchild Weivoda, D.O., at AMNC.  She reported chronic neck pain for five years and "persistent left buttock pain" after the fall on the ice. On physical examination, Ms. T. had high blood pressure, was alert and oriented, and in no acute distress.  Dr. Weivoda referred Ms. T. to physical therapy, increased her prescription for gabapentin, and refilled her prescription for naproxen 500 mg.[81]

---

[79] A.R. 449–53.

[80] A.R. 454–59.  On December 23, 2016, Dr. Weidner had earlier diagnosed Ms. T. with occipital neuralgia and performed a bilateral occipital nerve block.  A.R. 463–64.

[81] A.R. 447–48.

On May 16, 2017, Ms. T. had x-rays of the cervical spine. The x-rays showed "stable fusion of C4 through T2."[82]

On June 5, 2017, Ms. T. saw Dan Korn, M.D., at the emergency department at ANMC. She reported lower abdominal pain. On physical examination, Dr. Korn observed that Ms. T. was alert and oriented; in no acute distress; and with normal sensory, motor, and speech. He observed a soft, non-distended abdomen with moderate tenderness with no rebound and no guarding. He noted that the CT scan of the abdomen and pelvis showed no evidence of acute diverticulitis and no acute inflammation or large ovarian cyst. She was discharged home on the same day.[83]

On June 23, 2017, Ms. T. attended a physical therapy session with Susan Ryznar, MPT, OCS. She reported ongoing cervical spine pain/discomfort. On physical examination, MPT Ryznar observed "posture dysfunction, scapular stab [and] RTC strength deficits, guarded-protected postures adding to pain symptoms, and pain affecting function." MPT Ryznar recommended 6-10 weeks of physical therapy and "was 'pleasantly' surprised with [Ms. T.'s] symptom reduction." MPT Ryznar opined that Ms. T. was "a good candidate for skilled PT and presents with no barriers to rehab[ilitation]." However, there are no more physical therapy records in the medical record.[84]

---

[82] A.R. 446.

[83] A.R. 429–441.

[84] A.R. 442–445.

On November 26, 2017, Ms. T. saw Leah Bramer, PA-C, at the emergency department at ANMC. She reported lower back pain for the past month. PA Bramer noted that Ms. T. denied bowel or bladder dysfunction, numbness, fever, chills, weakness, fatigue, nausea, vomiting, hematuria, vaginal discharge, and/or abdominal pain. On physical examination, PA Bramer observed that Ms. T. was alert, in no acute distress, with a supple neck and no tenderness, a normal gait, was cooperative, and had an appropriate mood and affect. The x-rays taken at the visit showed "mild degenerative change[s] but no acute osseous findings." Ms. T. was discharged the same day.[85]

On December 1, 2017, Ms. T. saw Sarah Dobbs, M.D., at ANMC. She reported low back pain. Dr. Dobbs noted that Ms. T. had a "backache – no red flag symptoms." Dr. Dobbs referred Ms. T. to physical therapy "to help with core strengthening exercises."[86]

On February 23, 2018, Ms. T. saw Brian Boden, PA-C, at the emergency department at ANMC. She reported one week of dizziness and nausea. PA Boden noted that Ms. T. had a history of iron deficiency anemia and that her current reported symptoms were similar to previous episodes of anemia. He also noted that she "continues to get placed on iron supplement and her symptoms improved. She then [gets] taken off, and returns." Ms. T. reported no back pain, muscle pain, joint pain; and no anxiety or depression. On physical examination, Ms. T. had low blood pressure and was alert and oriented with normal motor, speech, and coordination. PA Boden assessed Ms. T. with

---

[85] A.R. 420–28.

[86] A.R. 417–19.

iron deficiency anemia and prescribed an iron supplement and stool softener.  He later noted that Ms. T.'s anemia condition had improved and was stable.  Ms. T. was discharged the same day and instructed to follow up with her primary provider within two to four weeks and return to the emergency department if her symptoms worsened.[87]

*Hearing Testimony on April 20, 2018*

Ms. T. attended a hearing before ALJ Hebda on April 20, 2018 with representation. She testified that she first started experiencing back pain in 2010.  She testified that she was always in pain, lived with her mother, and couldn't "really function with everyday life like most people can."  She testified that she could sit for about a half-hour.  She indicated that she feels like "Grand Central Station" when she is in public and that she was "dizzy a lot."  She noted that she "just hear[s] a lot of mixed voices, and I don't want to be around that, so I'm constantly staying home, I avoid public, people."  Ms. T. indicated that her periods made her "really weak [ ] and dizzy."  She reported last working at Golden Corral "probably about ten years ago."  Ms. T. testified that she worked as a personal care attendant for her aunt in 2004.[88]

Jack LeBeau, M.D., testified as the medical expert.  Based on his review of the record, Dr. LeBeau indicated that Ms. T.'s primary physical problems were iron deficiency anemia, neck pain after multiple surgeries, lumbar disease without impingement, tailbone fracture, occipital neuralgia, pelvic inflammatory disease, tobacco-dependence, and

---

[87] A.R. 410–16.  There appear to be no records of Ms. T. returning to the emergency department at ANMC or following up with her primary care provider regarding anemia after February 2018.

[88] A.R. 49–53.

abuse of marijuana and cocaine. Dr. LeBeau opined that Ms. T. did not meet or equal a listing for her cervical spine because "when you really get down to the nuts and bolts, if you're going to meet or equal, you've got to have radiculopathy. . . and I don't think she has that." He opined that Ms. T.'s anemia was "intermittently symptomatic." He noted that Ms. T.'s chronic pain syndrome of the neck and low back pain syndrome were "controlled, and you don't have to set her on narcotics." Dr. LeBeau opined "on the assumption that she has a normal hemoglobin," that Ms. T. should be able to lift and carry 10 pounds frequently and 11 to 20 pounds occasionally; sit for six hours in a full workday with a lumbar chair; stand three hours in a workday; walk one hour in a workday; reach overhead frequently; handle, finger, and feel frequently; never climb ladders or scaffolds; climb stairs and ramps occasionally; balance frequently; stoop, kneel, crouch, and crawl occasionally; never work at unprotected heights; and work with moving mechanical parts occasionally. Based on Ms. T.'s counsel's question regarding low hemoglobin, Dr. LeBeau responded that Ms. T.'s daily activities would be affected due to depression and "physiological things that are going on," including shortness of breath, dizziness, clumsiness, and weakness/lack of endurance. He noted, "from a physician's angle, this is a problem to be solved." Dr. LeBeau testified, "put it this way, if we just would get her blood fixed, she'd be very, very good, and then you concentrate maybe on a better situation as far as getting your pain under control if the rest of her metabolism is favorable."[89]

---

[89] A.R. 33–44.

Colette Valette, Ph.D., testified as the psychological medical expert.  Based on her review of the record, Dr. Valette noted diagnoses in the record of cocaine and alcohol abuse; bipolar, unspecified; and generalized anxiety disorder.  She opined that Ms. T.'s bipolar disorder did not meet or equal a listing.  Dr. Valette testified that Ms. T.'s substance abuse did not interfere with her functioning and her "anxiety and labile affect" were not considered an impairment on an ongoing basis.  She noted Ms. T. had a single diagnosis of generalized anxiety disorder that was not supported.[90]  Dr. Valette also noted the records indicated that Ms. T. attended only four appointments for psychological treatment and had no psychiatric hospitalizations.[91]

William Weiss testified as the vocational expert.  Based on the ALJ's first hypothetical,[92] he opined that Ms. T. could perform her past work.  VE Weiss also testified that there were other jobs an individual the same age, education, and work experience

---

[90] A.R. 44–49.

[91] The entire medical record before the Court shows Ms. T. attended more than four appointments for psychological treatment.  See A.R. 1846–52, 255–60, 275–81, 293, 388–91, 392–95, 399–400, 2342–43.  However, after the August 3, 2016 application date, Ms. T. attended four appointments with ANP Campbell.  A fifth contact in October 2016 was a phone contact.  Docket 15 at 12; see also A.R. 392–95, 397, 399–400, 2342–43.

[92] The ALJ's first hypothetical was as follows:

> I have an individual of the claimant's age, education, and past work experience, who would be able to perform light level work as defined by the Social Security Administration, but we're going to have the following limitations.
>
> As far as climbing of ramps and stairs, stooping, kneeling, crouching, and crawling, those would all be at the occasional level. I would have only frequent balancing, no climbing of ladders, ropes, or scaffolding, no exposure to unprotected heights, and only occasional exposure to moving and hazardous machinery.  Manipulative limitations would be overhead reaching bilaterally, would be at the frequent level, as would handling, fingering, and feeling. A.R. 56.

as Ms. T. could perform, including cleaner maid and office helper.  Based on the ALJ's

second hypothetical,[93] VE Weiss opined that the "junior maid" position would be excluded,

but not the "attendant" or office helper jobs.  VE Weiss testified that if the hypothetical

individual could only handle and finger infrequently, manual tasks "could be a problem."[94]

### Ms. T.'s Function Reports

Ms. T. completed an undated function report.[95]  She reported, "it hurts to stand or

sit to[o] long" and that she "can't even lay right to sleep."  She also reported that her

"anxiety make[s] it to where at times I don't want to leave the house or even my room."

She stated, it "hurts to put clothes over my head and bent over"; "to bend or shave or

shampoo"; and she "can't lift [her] hands over [her] head for too long."  Ms. T. reported

that she could prepare her own meals and that her mother helped her with household

chores.  She indicated that she was able to pay bills, count change, handle a savings

account, and use a checkbook/money orders, but that her mother did the shopping.  She

indicated she spent time with others on the computer and at family functions.  Ms. T.

reported that her conditions affected lifting, squatting, bending, standing, reaching,

walking, sitting, kneeling, talking, stair-climbing, completing tasks, concentration,

---

[93] The ALJ's second hypothetical was as follows:

> Let me ask you to continue with the same hypothetical individual, and with the prior
> residual functional capacity, but, say I would add a sit/stand option, which would
> allow the individual to alternate sitting or standing positions throughout the day
> without going off task.  A.R. 57.

[94] A.R. 54–59.

[95] The Court Transcript Index shows a date of August 30, 2016 for the function report.  Docket 11-
2 at 1.

understanding, following instructions, using hands, and getting along with others. She remarked that "[h]aving bi-polar make[s] me angry all the time then happy. It goes back and forth daily" and "anxiety keeps me from leaving the house a lot."[96]

On October 2, 2016, Kent R., a friend, completed a function report on Ms. T.'s behalf. He reported that he had known Ms. T. for 20 years and spent time with Ms. T. on a daily basis. He indicated that dressing, bathing, caring for her hair, and shaving hurt Ms. T.'s neck. Mr. R. also reported that Ms. T. could prepare simple food and that her mother helped Ms. T. with household chores. He indicated that Ms. T.'s conditions affected lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others. Mr. R. noted that Ms. T.'s back and neck bothered her and her "bipolar/anxiety stops her from being around people." He also reported, "I have witnessed extreme mood changes from day to day, happy one minute then angry the next minute. Sleeping is a real issue, due to surgeries on her neck. Her anxiety when it comes to groups or crowded areas with many people has gotten worse."[97]

## IV.    DISCUSSION

Ms. T. is represented by counsel. In her opening brief, Ms. T. alleges that the ALJ's decision is not supported by substantial evidence because: (1) the RFC did not account

---

[96] A.R. 187–94.

[97] A.R. 178–86.

for anemia; (2) the ALJ failed to "fully and fairly develop the record with respect to the adverse vocational functional impact of anemia"; and (3) the ALJ found no limitations due to mental impairments.[98]  The Commissioner disputes Ms. T.'s assertions.[99]  The Court addresses each of Ms. T.'s assertions in turn:

A.  The RFC Assessment

Ms. T. alleges in her brief that the ALJ's RFC "intentionally ignored anemia" and the ALJ erred by relying on Dr. LeBeau's opinion because it "explicitly factors out anemia."[100]  The Commissioner asserts that Dr. LeBeau's opinion and independent medical evidence "indicated [Ms. T.]'s anemia was controllable with treatment and therefore not disabling for the purpose of benefits."[101]  Ms. T. also asserts that the "final agency decision is not supported by substantial evidence and is the product of reversible errors of law because it found no limitations due to mental impairments, which adversely affected Ms. Toliver's RFC formulation."[102]  The Commissioner contends that "[w]here the ALJ relied on both the opinion of Dr. Valette and other medical evidence showing that [Ms. T.]'s mental impairments did not warrant RFC limitations, substantial evidence supported the ALJ's decision not to include mental limitations in the RFC."[103]

_____

[98] Docket 14 at 14–23.

[99] Docket 15 at 4–14.

[100] Docket 14 at 14.

[101] Docket 15 at 4–5.

[102] Docket 14 at 19.

[103] Docket 15 at 11.

1.  *Legal Standard*

A court should affirm an ALJ's determination of a claimant's RFC "if the ALJ applied the proper legal standard and his decision is supported by substantial evidence."[104]  In assessing an RFC, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"[105]  It is "proper for an ALJ to limit a hypothetical to those impairments that are supported by substantial evidence in the record."[106]  And, courts have held that "[c]onsideration of 'the limiting effects of all impairments' does not necessarily require the inclusion of every impairment into the final RFC if the record indicates the non-severe impairment does not cause a significant limitation in the plaintiff's ability to work."[107]  However, "an RFC that fails to take into account a claimant's limitations is defective."[108]

---

[104] *Bayliss v. Barnhart,* 427 F.3d 1211, 1217 (9th Cir. 2005) (citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999)).

[105] *See* SSR 96-08p, *available at* 1996 WL 374184 at *5; 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe.'").  *See also Bray v. Comm'r of Soc. Sec. Admin.,* 554 F.3d 1219, 1224 (9th Cir. 2009) ("SSRs do not carry the 'force of law,' but they are binding on ALJs nonetheless.").

[106] *Osenbrock v. Apfel,* 240 F.3d 1157, 1165 (9th Cir. 2001) (citing *Magallanes v. Bowen,* 881 F.2d 747, 756-57 (9th Cir. 1989) ("the ALJ was free to accept . . . that the claimant's depression was mild and would not significantly interfere with the performance of work related activities.")).

[107] *See Medlock v. Colvin,* No. 15-cv-9609-KK, 2016 WL 6137399, at *5 (C.D. Cal. Oct. 20, 2016) (emphases omitted); *Sisco v. Colvin,* No. 13-cv-01817-LHK, 2014 WL 2859187, at *8 (N.D. Cal. June 20, 2014); *Burch v. Barnhart,* 400 F.3d 676, 684 (9th Cir. 2005) (finding ALJ's decision not to include plaintiff's obesity impairment in the RFC determination was proper).

[108] *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).

## 2. *Anemia and the RFC Assessment*

In his decision, the ALJ discussed Ms. T.'s history of iron deficiency anemia and noted specifically that hospital records from February 2018 showed that Ms. T.'s symptoms resolved with supplement medication and "despite her complaints of dizziness at that time, she was objectively observed to ambulate with a steady gait"; had normal musculoskeletal range of motion and no signs of swelling or tenderness; normal motor behavior; and normal coordination.[109]  In June 2016, Dr. Andre diagnosed Ms. T. with "anemia last year, resolved now."[110]

Additionally, the ALJ considered medical expert Dr. LeBeau's testimony and generally gave great weight to Dr. LeBeau's specific functional limitations.[111]  Despite Ms. T.'s argument to the contrary, Dr. LeBeau acknowledged Ms. T.'s anemia and her associated symptoms "going back to at least 2015" and discussed Ms. T.'s hemoglobin level at her February 2018 hospitalization.[112]  Dr. LeBeau then initially provided an RFC based on the assumption that Ms. T. had a normal hemoglobin level.  He concluded that Ms. T.'s anemia was controllable and not a limitation; it "just needs to be sorted out."[113]

---

[109] A.R. 17, 19, 410–16.

[110] A.R. 261–74.

[111] A.R. 19.  *See also Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002) (The opinion of a non-treating or non-examining physician may serve as substantial evidence when the opinion is consistent with independent clinical findings or other evidence in the record).

[112] A.R. 34, 37, 264, 413.  Ms. T. argues that "the agency sought to limit the evidence to on and after the 2016 application, which is erroneous."  Docket 14 at 17.

[113] A.R. 34, 38.  *Wellington v. Berryhill,* 878 F.3d 867, 876 (9th Cir. 2017) (citing 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1) ("Evidence of medical treatment successfully relieving symptoms can undermine a claim of disability."); *Warre ex rel. E.T. IV v. Comm'r of Soc. Sec.*

But Dr. LeBeau then testified, "I said allow for a full hemoglobin, but once in a while it isn't so full, and her symptom is dizziness when she gets anemic." He then opined that Ms. T. should never climb ladders or scaffolds and only occasionally climb stairs or ramps due to pain and "the possibility to intermittently being dizzy from anemia."[114] Accordingly, contrary to Ms. T.'s arguments to this Court, Dr. LeBeau did factor in the anemia to some degree in his RFC assessment.

The ALJ took anemia into account in formulating the RFC. Specifically, he concluded that Ms. T. could perform light work with limitations, including no climbing of ladders or scaffolds and occasional climbing of stairs and ramps.[115]

For the foregoing reasons, the ALJ sufficiently addressed Ms. T.'s functional limitations due to anemia and the RFC in this regard was supported by substantial evidence in the record, including Dr. LeBeau's testimony.

### 3. Mental Impairments and the RFC

The ALJ discussed Ms. T.'s mental impairments at both Step 2 and 3 of the analysis. The ALJ reviewed the treatment records that showed Ms. T.'s mental health symptoms were treated with medications.[116] The ALJ concluded that Ms. T. "does not

---

*Admin.,* 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

[114] A.R. 39. Dr. LeBeau explained, "I said allow for a full hemoglobin, but once in a while it isn't full, and her sympton is dizziness when she gets anmeic. So I would certainly just say never on [ladders or scaffolds]."

[115] A.R. 17.

[116] A.R. 16, 392–95. *See Wellington v. Berryhill,* 878 F.3d 867, 876 (9th Cir. 2017) (citing 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1) ("Evidence of medical treatment successfully relieving symptoms can undermine a claim of disability."); *Warre ex rel. E.T. IV v. Comm'r of Soc. Sec.*

have a mental health impairment that causes her any significant functional limitations on her ability to perform basic mental work activities."[117]  As a result, the RFC does not include any mental health limitations.   Ms. T. asserts these determinations are not supported by substantial evidence in the record.

In making these mental health determinations, the  ALJ also gave great weight to testifying expert Dr. Valette's opinion that Ms. T. had no severe mental health impairments.[118]  Ms. T. argues that the ALJ erred by relying on Dr. Valette's opinion, in part because Dr. Valette only referenced four of Ms. T.'s psychological appointments.[119] The  Court  disagrees.   In  referencing  only  four  psychology  sessions,  Dr. Valette's testimony was consistent with the instructions of the ALJ that she focus her testimony on the time period after August 3, 2016.[120]  Further, Dr. Valette's testimony also includes specific references to treatment notes from 2012 through 2018.[121]  Even if Dr. Valette's appointment count was incorrect, it was not clear error for Dr. Valette to note Ms. T.'s

---

*Admin.,* 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

[117] A.R. 16.

[118] A.R. 16, 44–48.

[119] Ms. T. argues that Dr. Valette's "opinion is defective because she admittedly did not review more than four encounters…."  Docket 14 at 20.  The entire medical record before the Court shows Ms. T. attended more than four appointments for psychological treatment. *See* A.R. 1846–52, 255–60, 275–81, 293, 388–91, 392–95, 399–400, 2342–43.  However, as the Commissioner points out in his brief, during the time period after the August 3, 2016 application date, Ms. T. attended a total of four appointments with ANP Campbell.  A fifth contact in October 2016 was a phone contact.  Docket 15 at 12; *see also* A.R. 392–95, 397, 399–400, 2342–43.

[120] A.R. 30, 33.

[121] A.R. 47, 48 (multiple references to the record before the ALJ at the April 2018 hearing).

relatively few psychology appointments in a period of almost two years between the date

of application in August 2016 and the date of the ALJ decision in June 2018.

The record also shows that Ms. T. did not seek treatment for her mental

impairments after March 6, 2017.[122]  And, although Ms. T. reported, "[h]aving bi-polar

make[s] me angry all the time then happy.  It goes back and forth daily" and that "anxiety

keeps me from leaving the house a lot," the ALJ pointed to treatment notes consistently

indicating Ms. T. had "overall logical and goal-directed thought processes" and "fair

judgment and insight, no suicidal ideation, and no signs of delusions or psychosis."[123]

Further, the ALJ specifically noted in the decision that "the following residual functional

capacity assessment reflects the degree of limitation the undersigned has found in the

'paragraph B' mental functional analysis" in Steps 2 and 3.[124]  In making his RFC

determination, the ALJ took into account those limitations for which there was support in

---

[122] A.R. 2342–43.  On March 16, 2017, March 21, 2017, and April 24, 2017, a staff member at SouthCentral Foundation Behavioral Services Division attempted to schedule future appointments for Ms. T. with ANP Campbell.  A.R. 2345–47.  On April 28, 2017, Ms. T. requested to pick up records of her sessions with ANP Campbell.  A.R. 2348.

[123] A.R. 16, 194, 392–95, 399–400, 449–53, 2342–43.

[124] In the ALJ stated:

> The limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p).  Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis.  A.R. 16.

the record.[125]  Thus, the ALJ did not err in concluding there were no limitations in the RFC due to mental impairments.  The RFC was supported by substantial evidence and free from legal error.

B. Development of the Record

Ms. T. asserts that the ALJ failed to fully and fairly develop the record because "the ALJ should have brought the inquiry back to the evidence of record by requiring [Dr. LeBeau] to factor anemia into his opinion."  She also alleges that the ALJ failed to fully and fairly develop the record "with respect to depression as a symptom of anemia."[126]  In response, the Commissioner contends that the "record before the ALJ was neither ambiguous nor inadequate to allow for proper evaluation of [Ms. T.]'s anemia."[127]

The ALJ has an "independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[128]  An "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is

---

[125] *Bayliss,* 427 F.3d at 1217 ("Dr. Freeman's opinion was not supported by clinical evidence and was based on Bayliss's subjective complaints.").  Ms. T.'s citation to *Ghanim v. Colvin,* 763 F. 3d 1154, 1161–62 (9th Cir. 2014), seems misplaced in the context of her argument that courts "respect the ability of mental health professionals to assess and evaluate subjective symptoms, and to describe them in medical diagnostic and therapeutic terms."  Docket 14 at 22.  The paragraph in *Ghanim* cited by Ms. T. does not address a mental health professional's ability to assess subjective symptoms.  Instead, it addresses occasional improvement of depression symptoms as not inconsistent with disability.  *Ghanim,* 763 F. at 1161–62.

[126] Docket 14 at 17–18.

[127] Docket 15 at 8.

[128] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001) (internal citations and quotations omitted).

inadequate to allow for proper evaluation of the evidence."[129]  Further, "[a]n ALJ is required to recontact a doctor only if the doctor's report is ambiguous or insufficient for the ALJ to make a disability determination."[130]  Here, the ALJ considered and discussed Ms. T.'s history of iron deficiency anemia and gave great weight to Dr. LeBeau's testimony.[131]  He included Dr. LeBeau's recommended limitations to the RFC for Ms. T.'s occasional bouts of dizziness due to anemia, including no climbing of ladders and scaffolds and occasional climbing of stairs and ramps.[132]  The ALJ did not address Dr. LeBeau's testimony connecting depression and anemia, but Dr. LeBeau testified that Ms. T.'s anemia was only intermittent.[133]  Ms. T.'s treating physicians diagnosed her with only "mild to no depressive symptoms" and Ms. T.'s mental impairments, including depression, were discussed by the ALJ in his decision.[134]  Ms. T.'s counsel was given the opportunity to question Dr. LeBeau at the April 2018 hearing and the attorney did ask questions regarding Ms. T.'s anemia.[135]

For the foregoing reasons, the ALJ adequately developed the record regarding Ms.

---

[129] *McLeod v. Astrue,* 640 F.3d 881, 885 (9th Cir. 2011) (internal citations omitted).

[130] *Bayliss,* 427 F.3d at 1217 (9th Cir. 2005); 20 C.F.R. §§ 404.1512(e), 416.912(e).

[131] A.R. 18–19, 39, 41–44.

[132] A.R. 17.

[133] A.R. 37, 39.

[134] A.R. 16–17.  *See also* A.R. 410 ("no depression") and A.R. 537 ("mild to no depressive symptoms").

[135] A.R. 41–44.

T.'s depression; the ALJ did not have duty to recontact Dr. LeBeau.

## V.   ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are free from legal error and supported by substantial evidence in the record as a whole.  Accordingly, IT IS ORDERED that Ms. T.'s request for relief at Docket 14 is DENIED as set forth herein and the Commissioner's final decision is AFFIRMED.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 5th day of February, 2020 at Anchorage, Alaska.


/s/ Sharon L. Gleason_____
UNITED STATES DISTRICT JUDGE